UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ROCKIES EXPRESS PIPELINE LLC, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     vs. | ) CASE NO: 1:08-cv-0751-RLY-DML |
| | ) |
| 58.6 ACRES, BEX FARMS, INC., 58.6 ACRES, 232.57 ACRES, JW JONES MATERIALS, LLC, 232.57 ACRES, 267.272 ACRES, BEX FARMS INC., 267.272 ACRES, COLEEN K. MEAL LIVING TRUST, 80 ACRES, 144.818 ACRES, RAMP LOCUST GROVE FARM, INC, 144.818 ACRES, 22.5 ACRES, DONALD E. BATES, 22.5 ACRES, ADDITIONAL UNKNOWN INTEREST OWNERS, SANDRA RITZ, 80 ACRES, JOYCE A. DAVIS, II, 55.283 ACRES, THOMAS C. DAVIS, II, 55.283 ACRES, 3.25 ACRES, GARY YANE, 83.25 ACRES, MONICA YANE, 83.25 ACRES, JOYCE A. DAVIS, II, 55.283 ACRES, THOMAS C. DAVIS, II, 55.283 ACRES, GARY B. MORGAN, 80 ACRES, and CAROLYN F. MORGAN, 80 ACRES, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| | ) |
|     Respondents. | ) |

## Order on Bex Farms Inc.'s Motion to Compel

This matter is before the court on Bex Farms Inc.'s ("Bex Farms") Motion to Compel (Dkt. 671). Bex Farms seeks production of documents from Rockies Express Pipeline, LLC ("REX") and Contract Land Staff, LLC ("CLS") in connection with its claim that it had reached an agreement with REX on the value to be paid for Bex Farms's property rights. REX maintains that the documents Bex Farms has requested are shielded from discovery by attorney-client privilege, work product doctrine, or both. The court finds that REX has not met its burden of demonstrating that the communications contained in the documents are protected by attorney-client or work product privileges, and that any privileges that did exist were nevertheless waived

1

by voluntary disclosure. The court therefore **GRANTS** Bex Farms's motion to compel, as explained below.

## Background

REX is building a 639-mile natural gas pipeline across the Midwest. It hired CLS to, among other things, assist it in contacting landowners to facilitate property acquisition along the pipeline construction route. Wendell McClellan began working for CLS on October 8, 2007. He worked only on the REX pipeline project, and his duties were to meet with the landowner, verify ownership, and to negotiate terms and pricing for easements necessary for construction and maintenance of the pipeline.

On May 19, 2008, McClellan sent a written offer of $24,225 to Daniel Balkema of Bex Farms to obtain an easement on Bex Farms's property. This offer did not include any compensation for the mineral interests on Bex Farms's property. Bex Farms rejected the May 19 offer on June 19, 2008. Throughout the summer of 2008, Balkema of Bex Farms and McClellan of CLS continued to negotiate a price for the easement and associated mineral interests, having numerous calls and one meeting. The next written offer McClellan extended to Balkema was made on August 19, 2008, and it included compensation for gravel reserves at $4.00 per ton, for a total offer of over $6 million.

Both sides agree that McClellan and Balkema spoke by phone again on September 5, 2008, and that during that call McClellan conveyed an offer of $4.50 per ton. The total payment provided by that offer would have totaled over $6.8 million. McClellan sent a letter via FedEx to Bex Farms on September 6, 2008, confirming that offer. At this point, the factual positions of the two sides diverge. REX claims that Balkema made a counter-offer in the amount of $4.65 per ton shortly after the $4.50 offer, thereby rejecting the latter, but Balkema denies he made a

counter-offer. He maintains he simply conveyed to McClellen that he knew his family would agree to $4.65 and that he would check whether they would accept REX's offer of $4.50 per ton.

REX contends that Balkema and McClellan again discussed settlement on a price during a telephone conversation on September 26, 2008. McClellan testified that Balkema informed him on that date that Bex Farms would take $4.50 per ton but that he (McClellan) informed Balkema that the negotiations were on hold because the value of reserves was less than what REX had offered and Bex Farms had already rejected. Balkema says he told McClellan on September 26 that Bex Farms would accept $4.50 per ton and that McClellan then told him for the first time that the $4.50 offer was off the table.

Balkema apparently called McClellan on October 2, 2008, to discuss these matters. Their respective testimony about that call does not differ markedly. McClellan recalls that Balkema asked whether REX was willing to negotiate and that he told Balkema the matter would have to be resolved in court. Balkema maintains that he asked McClellan whether he had heard anything further from REX and that McClellan said the property matter would go through the condemnation process.

An October 10, 2008 letter from Bex Farms followed and purported to confirm the "prior oral agreement" of $4.50 per ton that had been offered in the September 6, 2008 letter. On October 22, 2008, Philip B. McKiernan, counsel for REX with the law firm of Hackman Hulett & Cracraft LLP ("HHC"), sent a letter to Bex Farms advising it of REX's position that there was no agreement because Bex Farms had rejected REX's September 6 offer.

Bex Farms has filed a Motion to Enforce Settlement (Dkt. 693). Both parties have conducted discovery of the issues presented, which has led to this dispute.

**Discovery Issues**

On June 26, 2009, Bex Farms served REX with discovery requests that sought all documents in REX's possession or control relating to or evidencing the settlement negotiations between Bex Farms and REX. Bex Farms also sent a subpoena and request for nonparty production of documents to CLS that requested similar information.

CLS and REX both responded to Bex Farms's discovery in late July by producing some documents, along with privilege logs that identify 61 documents CLS has withheld from production and 64 documents REX has withheld from production. REX and CLS both maintain that work product doctrine or attorney-client privilege prevents disclosure of these documents.

Bex Farms filed its motion to compel on August 28, 2009, arguing there is no justification for the assertions of attorney-client or work product privileges for the 64 documents on REX's privilege log.[1] It also contends that any privilege attached to the documents has been waived by REX. In addition to challenging REX's assertion of privilege, Bex Farms maintains that REX has failed to produce other responsive documents that, according to testimony in this case, do exist.

**Analysis**

The Federal Rules of Civil Procedure afford litigants liberal discovery of "any nonprivileged matter that is relevant to any party's claim or defense." Fed.R.Civ.P. 26(b)(1). For discovery purposes, "relevance" includes information properly admissible at trial and anything "reasonably calculated to lead to the discovery of admissible evidence." *Id*. A party seeking to invoke a privilege bears the burden of establishing the existence of the privilege, and any doubts about the applicability of the privilege must be resolved in favor of disclosure. *United States v.*

---

[1] The court assumes the documents listed on REX's privilege log include the documents listed on CLS's log.

*22.80 Acres of Land*, 107 F.R.D. 20, 22 (N.D. Cal. 1985). REX does not argue that the withheld documents are irrelevant, but that they are shielded from production by privilege.[2]

A. **Attorney-client Privilege**

Indiana law has long provided "when an attorney is consulted on business within the scope of his profession, the communications on the subject between him and his client should be treated as strictly confidential." *Bassett v. State*, 895 N.E.2d 1201, 1206 (Ind. 2008). The burden of proof is on the person asserting the privilege to show that the consultation was a professional one. *Id*. The essential prerequisites to show the applicability of the privilege are (1) the existence of an attorney-client relationship, and (2) the exchange of a confidential communication. *Mayberry v. State*, 670 N.E.2d 1262, 1266 (Ind. 1996). When the party seeking to invoke the privilege has shown that the prerequisites have been satisfied, the burden shifts to the party opposing the assertion of privilege to show that the communications are not protected because the confidentiality was waived or otherwise nullified. *Bassett*, 895 N.E.2d at 1206.

The first question presented by the motion to compel is whether communications between CLS and REX's attorneys are not privileged because they were made by a third party, CLS. REX argues that CLS was its agent, so that any communication to or from CLS on which REX's attorneys were copied is protected by REX's attorney-client privilege, citing *Upjohn Co. v. U.S.*, 449 U.S. 383, 390 (1981). In that case, Upjohn employees provided information to Upjohn's counsel at the direction of corporate superiors regarding payments that were the subject of the

---

[2] On October 13, 2009, the court requested submissions from the parties to address what effect the statute of frauds should have, if any, on the court's consideration of the motion to compel. Both sides briefed this issue, and the court finds that this issue is intertwined with the merits of Bex Farms's claim that a contract existed and will not resolve that question in ruling on this motion to compel.

litigation. The Court held that these communications were privileged because they were made to provide counsel with information necessary to counsel's provision of legal advice. *Id*. at 394.

That case is distinguishable, however, because the agents in *Upjohn* had knowledge of facts that were the basis of the representation and the communication of those facts was what formed the basis for the attorney-client privilege. Here, however, REX has not shown that CLS or its employees had knowledge of the facts for which REX had retained HHC or that the interests CLS shared with REX intersected. REX had apparently retained HHC to represent its interests in condemnation lawsuits against the landowners where negotiations failed. REX has not shown that HHC provided legal services or advice related to the CLS negotiations. Additionally, REX has not shown that the CLS negotiations affected the legal advice HHC provided to REX. Merely sending the CLS emails to HHC is not enough to create an attorney-client privilege.

The attorney-client privilege "only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn Co*., 449 U.S. at 395. The Court explained,

> The client cannot be compelled to answer the question, "What did you say or write to the attorney?" but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney."

*Id*. at 395-96 (quoting *Philadelphia v. Westinghouse Electric Corp*., 205 F.Supp. 830, 831 (E.D. Penn. 1962)). Moreover, communications do not become privileged just because they were made to attorneys; they must have been made for the purpose of obtaining legal advice. *See Tyne v. Time Warner Entertainment Co*., 212 F.R.D. 596, 600 n.4 (M.D. Fla. 2002) (ruling that distributing carbon copies of emails to attorneys does not prove privilege). As the proponent of

the privilege, REX has the burden of showing that the communications were made for the purpose of obtaining legal advice, and it has not carried that burden. The emails from CLS reported on progress it was making with Bex Farms on negotiating a land purchase. There is no indication that CLS sent the emails to obtain legal advice or to report facts to facilitate the provision of legal services. CLS reported the activities of its negotiations to REX in the regular course of its business of negotiating with landowners.

REX also argues that the common interest privilege protects the communications of CLS from disclosure. (REX's Response, at 13). The common interest privilege does not apply here, however, because CLS has no interest of its own to protect. The common interest privilege allows a defendant to assert the attorney-client privilege to protect its statements made in confidence to a co-defendant's attorney for purposes related to both their defenses. *Evans*, 113 F.3d at 1467. Any privilege that CLS's communications have stems from its status as a representative of REX. CLS is not independently seeking to protect its own interests, because it is not a co-defendant with interests to protect.

REX also contends that the emails are protected by the attorney-client privilege because they were sent to attorneys and were made after the commencement of litigation. This is not enough. First, as noted above, sending copies of emails to attorneys does not in itself create privilege. *See Tyne*, 212 F.R.D. at 600. Second, the fact that litigation had commenced at the time the emails were sent is not enough to show that the communications were made for the purpose of facilitating the provision of legal services. CLS was engaged in the same activity after suit had been filed as it had been before the filing of the condemnation complaint. CLS was not facilitating the lawsuit, but was engaging in a parallel effort to avoid it. Moreover, if CLS was not successful in negotiating a settlement, its communications with Bex Farms would have

7

no bearing on how the attorneys conducted the condemnation suit against Bex Farms. REX retained the attorneys for the purpose of filing suit when negotiations were not successful. There was no indication that the attorneys played any role in the negotiations. The facts indicate that HHC was carbon-copied to keep the lawyers abreast of the negotiations – not to seek legal advice related to those negotiations. The attorney-client privilege therefore does not shield the communications.

## B. Work Product Doctrine

The work product doctrine protects from disclosure documents or other tangible things prepared in anticipation of litigation or for trial by a party or its representative. Fed.R.Civ.P. 26(b)(3)(B). To be protected from disclosure under the work product doctrine, the materials: (1) must be documents and tangible things; (2) must have been prepared in anticipation of litigation or for trial; and (3) must have been prepared by or for a party or by or for a party's representative. *Boyer v. Gildea*, 257 F.R.D. 488, 491 (N.D. Ind. 2009).

REX has failed to demonstrate that the materials at issue were prepared in anticipation of litigation or for trial. The negotiation materials were prepared by an agent of CLS in its role of negotiating a purchase of the easement from Bex Farms. CLS did not act as an agent of REX in preparing for litigation. The purpose of the negotiations was to avoid litigation and facilitate settlement without the necessity of litigation. In fact, when REX purportedly decided that CLS could not reach an agreement with Bex Farms, it directed CLS to cease contact with Bex Farms.

The fact that REX sued Bex Farms while its negotiations with CLS were continuing does not alter this result. The protection of work-product immunity applies only to those documents "prepared in anticipation of litigation or for trial" by a party or its representative. Fed.R.Civ.P. 26(b)(3). The concept of "anticipation of litigation" embodies both a temporal and motivational

8

aspect. *Amway Corp. v. Procter & Gamble Co.*, 2001 WL 1818698, \*6 (W.D. Mich. 2001). "Materials may be prepared before or when litigation is pending without necessarily having been prepared 'in anticipation of litigation' from a motivational point of view." *Id*. CLS continued in its role of attempting to negotiate a settlement with Bex Farms – the same activity in which CLS had engaged before formal litigation. When it is clear documents would have been prepared regardless of any anticipation of use in litigation, no work product privilege can attach. *First Pac. Networks, Inc. v. Atlantic Mut. Ins. Co.*, 163 F.R.D. 574, 582 (N.D. Cal. 1995). The fact that REX had sued Bex Farms did not alter CLS's role, and CLS played no role in litigating the condemnation case against Bex Farms. Throughout the negotiations, CLS had emailed summaries of its contacts with landowners to REX, and this did not change once litigation started. CLS merely engaged in its same business activity of attempting to negotiate the transfer of property after the condemnation had been filed as it had engaged before the condemnation suit.[3]

    This conclusion finds support in *United States v. 22.80 Acres of Land*, 107 F.R.D. 20 (N.D. Cal. 1985). In that case, the court faced the question of whether the work product doctrine shielded from discovery an appraisal report prepared by an employee of the Bureau of Reclamation. The court found that the government did not meet its burden of proving that the report was prepared in anticipation of litigation, and the fact that the government eventually had to sue the landowner did not support its argument. The court reasoned it would not be consistent with the policies that inform the work product doctrine to conclude that a document should be protected from disclosure simply because it was prepared at the beginning of a process that

---

[3] REX sued Bex Farms on June 6, 2008, before some of the key communications. But in addition to the distinctions noted above, it is important to recognize that condemnation actions have two phases. The first – establishing the right to take – does not address the amount of compensation, which is the focus of the second phase.

eventually could result in litigation. *Id*. at 22. The court found that a key question in determining whether the work product doctrine protects the documents is whether they would have been prepared in the normal course of events – even if there had been no meaningful prospect of litigation. *Id*. at 24. The court further found that the government had not expected to resort to litigation at the time that the appraisal was prepared; it did not anticipate litigation until several months after the negotiations had commenced, when time pressures forced it to turn to another means to achieve its objectives. *Id*. The court concluded that the work product doctrine "simply was not designed to protect documents prepared under these circumstances. That doctrine, which derogates the truth finding process, was designed to offer limited protection to materials that are prepared *because* litigation is anticipated *and for the purpose* of helping a party to prepare to effectively litigate its side of a lawsuit." *Id*. at 25 (emphasis in original).

      The circumstances here are similar. Many of the communications between CLS and Bex Farms were made before litigation was imminent and in the normal course of CLS's business for a purpose completely independent of any litigation objective. Even after litigation was commenced, CLS acted with the intent of avoiding the active litigation of a condemnation suit against Bex Farms, and the nature of its communications did not change just because litigation had been commenced. CLS's role in attempting to negotiate a value for Bex Farms's property before a condemnation lawsuit compels a finding that its communications and negotiations were not made in anticipation of litigation. The work product doctrine does not shield its communications.

### C. Waiver of Attorney-Client and Work Product Privileges

During McClellan's deposition on September 2, 2009, REX introduced an unredacted copy of an October 14, 2008 email it had previously listed on its privilege log as protected by attorney-client privilege and work product doctrine. The email was written by McClellan and sent to REX's counsel, other CLS staff, and REX representatives. It summarized the price negotiations between Balkema and McClellan from the beginning of September through early October. REX introduced the unredacted email to refresh McClellan's recollection after McClellan had testified that Balkema never agreed to accept the price of $4.50 per ton. After reviewing the email, McClellan corrected his testimony and said that Balkema had verbally agreed to accept the $4.50 per ton price during a telephone conversation in late September. As a separate and independent ground for challenging REX's assertions on privilege, Bex Farms maintains that disclosure of this email constitutes a waiver of privilege as to all other communications on this subject. The court agrees.

The waiver of attorney-client privilege extends to all communications on the same subject matter. *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1032, 1314 n.18 (7th Cir. 1984). "The waiver extends beyond the document initially produced out of concerns for fairness, so that a party is prevented from disclosing communications that support its position while simultaneously concealing communications that do not." *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349 (Fed. Cir. 2005). This principle prevents a litigant from using the attorney-client privilege not as a shield but as a sword. *See Brown v. State*, 448 N.E.2d 10, 15 (Ind. 1983). The subject matter covered in the October 14, 2008 email is the negotiations between CLS and Bex Farms. By producing this email on this subject while REX had previously claimed that privilege

11

prevented disclosure of this subject matter, REX waived any privilege on the same subject matter, *i.e.,* the negotiations with Bex Farms.

In fact, unlike the other communications on the privilege log, the October 14, 2008 email had been prepared specifically at the direction of HHC, which had directed McClellan to prepare a summary of all of his communications with Bex Farms. While the court would have had reservations about ordering the production of communications to or from HHC after an active dispute arose over whether a contract had been formed, this voluntary production of the October 14, 2008 email eliminates that hesitation. Thus, even though this email may have been prepared in anticipation of litigation, the revelation of its substance during the deposition waived any privilege to be accorded it, as well as any privilege attached to any document relating to the same subject (the negotiations).

**D.     Additional Scrutiny of Communications Authored by HHC**

Although REX has not met its burden of demonstrating privileges for communications by or between CLS staff and sent to HHC, the court determines that communications authored by *HHC* and sent to CLS deserve an additional layer of scrutiny. Communications *from* an attorney are more likely to be of a legal nature, in contrast to a communication on which an attorney is merely "cc'd." In addition, without reviewing those documents, the court cannot conclude that they are within the scope of REX's waiver of privilege. The court therefore orders that those documents first be provided to the court for *in camera* review.

**E.     Assertions of Confidentiality**

Aside from its assertions of privilege, REX has argued that the documents Bex Farms seeks are protected from disclosure because they are confidential and would reveal REX's negotiation strategy. This does not prevent their disclosure. First, Bex Farms has already agreed to a

protective order that would prevent the disclosure of communications that reflect REX's negotiation strategy with landowners. Second, revelation of REX's earlier negotiation strategy to Bex Farms would not provide it with any advantage over REX because all parties have moved beyond the stage at which CLS was negotiating with landowners. *See Meharg v. I-Flow Corp.*, 2009 WL 3032327 (S.D. Ind. Sept. 18, 2009) (Hamilton, Chief Judge) (holding that settlement agreements are subject to the same disclosure standards as general discovery).

F. **The Missing Documents**

McClellan has testified that he routinely created contact notes that summarized his contacts with landowners. McClellan acknowledges he sent emails to CLS management that summarized his communications with Balkema after the written offers had been sent on August 17 and September 6, but no notes dated after August 7, 2008 have been produced, nor do they appear on any privilege log of CLS or REX. In addition, Bex Farms believes that not all emails created by McClellan and sent to REX that reported his contacts with Balkema have been produced for the period of August 17 through October 10, 2008. Despite eleven telephone calls during this period between Balkema and McClellan, Bex Farms has received communications created by McClellan that summarize or reference only five of them.

McClellan's deposition testimony evidences the likelihood that additional documents responsive to Bex Farms's discovery requests do (or did) exist. REX shall undertake a further search for such documents and, within 21 days of this order, produce any additional documents or certify its efforts and the disposition of the documents to counsel for Bex Farms, who can then determine how Bex Farms wishes to proceed.

**Conclusion**

The court orders REX to produce to Bex Farms, within 21 days of this Order, the documents that were created by CLS identified on its privilege logs. REX shall produce for *in camera* inspection within 21 days of this Order the communications identified on its privilege log that were authored by HHC. Those documents are to be submitted via email to *judgelynchchambers@insd.uscourts.gov*. Finally, REX shall also produce within 21 days of this Order any additional documents not listed on its privilege log but responsive to Bex Farms's discovery requests, or certify its search efforts and the disposition of the documents to counsel for Bex Farms.

So ORDERED.

Date: 12/31/2009

                                                    Debra McVicker Lynch
                                                    United States Magistrate Judge
                                                    Southern District of Indiana

See Attached for Distribution

Distribution:

Abigail B. Cella
ICE MILLER LLP
abby.cella@icemiller.com

Ronald Grant DeWaard
VARNUM RIDDERING SCHMIDT & HOWLETT
rgdewaard@varnumlaw.com

Frank I. Hamilton Jr
HAMILTON & TEBBE LAW OFFICE, P.C.
frank@hamiltontebbe.com

Joseph M. Hendel
HACKMAN HULETT & CRACRAFT LLP
jhendel@hhclaw.com

Andrea L. Hermer
DANN PECAR NEWMAN & KLEIMAN
ahermer@dannpecar.com

Robert Srader Hulett
HACKMAN HULETT & CRACRAFT LLP
rhulett@hhclaw.com

Philip B. McKiernan
HACKMAN HULETT & CRACRAFT, LLP
pmckiernan@hhclaw.com

H. Wayne Phears
MCGUIREWOODS LLP
wphears@mcguirewoods.com

Anthony Seaton Ridolfo Jr.
HACKMAN HULETT & CRACRAFT LLP
aridolfo@hhclaw.com

Jessica Erin Routley
AZO SERVICES INC.
JRoutley@azoservices.com

Philip David Sever
SEVER/STOREY
Phil@severstorey.com

Scott Roger Sikkenga
VARNUM RIDDERING SCHMIDT & HOWLETT LLP
srsikkenga@varnumlaw.com

Tonny D. Storey
SEVER/STOREY
tonny@severstorey.com

Christopher M. Tebbe
HAMILTON & TEBBE LAW OFFICE, P.C.
chris@hamiltontebbe.com

Mark Richard Waterfill
DANN PECAR NEWMAN & KLEIMAN
mwaterfill@dannpecar.com

Zeff A. Weiss
ICE MILLER LLP
weiss@icemiller.com